Ruth REICHMAN, Plaintiff,

v.

BUREAU OF AFFIRMATIVE ACTION,
et al., Defendants.

Civ. A. No. 78–767.

United States District Court,
M. D. Pennsylvania.

March 29, 1982.

Richard L. Berkman, Kathryn Delanty Portner, Dechert, Price & Rhoads, Philadelphia, Pa., for plaintiff.

Elisabeth S. Shuster, Norman J. Watkins, Kathleen McGrath, Allen C. Warshaw, Deputy Attys. Gen., Edward G. Biester, Jr., Atty. Gen., Pa. Dept. of Justice, Harrisburg, Pa., for defendants.

## OPINION

HERMAN, District Judge.

### I. INTRODUCTION

Plaintiff, Ruth Reichman, initiated this action against Defendants alleging employment discrimination on the basis of race, color, sex and religion. Specifically, she claimed that the actions, policies and practices of the Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e–5 and her constitutional rights as secured by 42 U.S.C. §§ 1981, 1983, 1985(3) and 1986. In addition, she alleged pendent state claims for defamation and violation of her rights under the Pennsylvania Human Relations Act, 43 P.S. §§ 951–963. The complaint named four Defendants: the Bureau of Affirmative Action ("BAA"), the agency responsible for the affirmative action program within the Commonwealth of Pennsylvania;[1] three black individuals in their capacities as state officials, Daniel P. Harley,[2] Daniel Sawyer,[3] and James N. Wade;[4] and the same three persons in their individual capacities. All of these individual Defendants acted under color of state law when they took employment actions affecting Plaintiff, including their participation in her furlough with the exception of the sex harassment allegations asserted by Plaintiff against Defendant Harley.[5]

Plaintiff filed a charge of discrimination with the EEOC on or about January 6, 1978, against Defendants in this case, which charge alleged, *inter alia*, that the BAA had a past and continuing pattern and/or practice of discrimination based on race and color in hiring, promotion, discipline, discharge, and other terms and conditions of employment which affected Plaintiff both as an individual and as a representative of other Caucasians. She also maintained that Defendants' decision to furlough her was discriminatorily based on race, color, sex, religion, national origin and handicap (no

1. The specific functions of BAA, as established by Executive Order No. 1975–7, dated May 14, 1975, are:

 a. Encourage and promote programs directed at ending discrimination against women and members of minority groups and *to develop affirmative action programs to involve them at all levels of employment.*

 b. Formulate affirmative action policy proposals for approval of the Secretary of Administration.

 c. Review agency affirmative action plans for consistency with affirmative action goals of the Commonwealth.

 d. Design and implement audit and reporting systems to measure the effectiveness of the Affirmative Action Program including individual agency programs.

 e. Perform related staff work required by the Secretary of Administration.

Defendants' Ex. 1 (emphasis added).

2. Defendant Daniel P. Harley was the Director of BAA from January 18, 1976 to September 1, 1978. Stipulation 6.

3. Defendant Daniel Sawyer was Special Assistant to the Secretary of Administration from December 1975 to July 1976, when he became Special Assistant to the Director of BAA; he was promoted to Director of BAA on September 1, 1978 and continued to hold that position through the trial of this case. Stipulation 7.

4. Defendant James N. Wade was Secretary of the Pennsylvania Governor's Office of Administration while Plaintiff was an employee of BAA. Stipulation 8. On October 23, 1980, upon motion by Defendants' counsel, the complaint was dismissed against James N. Wade, in his individual capacity.

5. Stipulation 9.

evidence of any handicap was ever produced) and in retaliation for her exercise of her constitutional rights.[6] The EEOC did not pursue an investigation of Plaintiff's charge and on May 23, 1978, the United States Department of Justice issued Plaintiff a "Notice of Right to Sue" based on the charges of discrimination which Plaintiff had filed with the EEOC.[7] On August 7, 1978, Plaintiff filed a timely complaint in this court as permitted by her right to sue letter and her earlier charge with the EEOC. The non-jury trial in this action lasted twelve days. Subsequently, parties submitted proposed findings of fact, conclusions of law, and supporting briefs. In addition, Plaintiff filed a motion for certification of a Rule 23(b)(2) class, which was fully briefed by the parties. Thereafter, on March 27, 1981, the court heard oral arguments in this matter. After studying of the briefs, hearing of oral argument, and the full consideration of all of the evidence and law relative thereto, the court makes the following findings of fact and conclusions of law.

## II. STATEMENT OF FACTS

Plaintiff, Ruth Reichman, is female, Jewish and Caucasian. She was employed by BAA, which is part of the Pennsylvania Governor's Office of Administration ("OA"), from October 28, 1976 until she was furloughed effective on November 10, 1977. While at BAA, Plaintiff was Chief of its Program and Technical Assistance Division ("PTA") and was an Equal Employment Opportunity Development Specialist V ("EODS V"). When Plaintiff started her job as Chief of PTA, she supervised Iris Cooley, a black EODS III; Kenneth O'Vell, a white EODS III, and Freda Keane, a white Clerk/Steno II. At that time, three EODS III vacancies existed in her division.

On January 27, 1977, Lang Lewis, a black male who was classified as a Public Administration Trainee in the Legal Division was transferred to Reichman's division. On March 22, 1977, Jean Becker, a white female who was classified as an EODS IV, was also transferred to the PTA Division working under Plaintiff's supervision.[8]

Since its inception in May of 1976, to the time of trial, twenty-three persons consisting of twelve Blacks and eleven Whites had been employed at BAA.[9] Although Gregg Thompson, a black male, worked for a period of time in BAA, he was not a BAA employee and he was not on the BAA payroll. While he was at BAA, he remained on the complement of the Governor's Office of Manpower. His salary was paid from federal CETA funds and his performance evaluations were still prepared by that office, not BAA.[10] Although one Caucasian was demoted while Plaintiff was at BAA,[11] Defendant Harley, a black man, took numerous positive steps to hire and promote white persons. While he was the Director of BAA, Harley hired Louise Oncley, a white female, to serve as Chief of the Planning, Research and Evaluation Division ("PRE"), starting work on October 28, 1976; Kenneth O'Vell, a white male, as an EODS II in the PTA Division, starting work on October 28, 1976; Freda Keane, a white female, as a Clerk/Steno II in the PTA Division, starting work on November 8, 1976; Sandra Synder, a white female, as a Clerk/Typist II as secretary to the Special Assistant, starting work on November 8, 1976; Robert Ford, a white male, as Assistant Director, starting work on January 6, 1977; and Julia Troutman, a white female, as a Clerk/Typist II in the Legal Division, starting work on April 14, 1977. In addition, Harley and Sawyer promoted the following white individuals: Freda Keane, a white female, from

6. Plaintiff's Ex. 56.

7. Plaintiff's Ex. 57.

8. Stipulations 1–3; Tr. 6–7; Plaintiff's Ex. 1a–1b; Defendant's Ex. 20a.

9. Stipulation 10.

10. Transcript ("Tr.") 407, 466–67.

11. This demotion was given to Jean Becker, a white female, who was reduced from an EODS VI to an EODS IV, without any decrease in her salary. Tr. 190. Ms. Becker was demoted five days before she was transferred to work under Reichman, an EODS V.

Clerk/Steno II to Clerk/Steno III, on July 5, 1978, and to an Administrative Assistant I on October 1, 1979; Sandra Synder, a white female, from Clerk/Typist II to Clerk/Steno II in October 1977; Julia Troutman, a white female, from Clerk/Typist II to Clerk/Typist III on October 1, 1979; and further encouraged Phyllis Riddle's placement in an EODS trainee position, following which she was promoted to an EODS II position in October 1978.[12] Furthermore, while Plaintiff was at BAA, two black professionals were promoted. Iris Cooley was promoted from an EODS III to an EODS IV and Lang Lewis was promoted from a Public Administration Trainee ("PAT") to an EODS II.[13] Lewis' position as a PAT was a probationary, entry level position. His promotion to an EODS II was not only routine, but required after the successful completion of his probationary period.[14]

### A. Reichman's Furlough

Prior to June 30, 1977, it became apparent that the 1977–78 Pennsylvania budget would not be passed before the beginning of that fiscal year. As a result of the fiscal problems created by the late passage of the budget, there were two "rounds" of furloughs. The first round of furloughs occurred in approximately July and August of 1977 after the start of the fiscal year but before a budget had been passed. The second round of furloughs resulted from the rebudget (i.e., the development of a budget based on the actual appropriations) and occurred in approximately October and November of 1977. The first round of furloughs was initiated when the Commonwealth's Budget Secretary issued a directive which ordered Commonwealth agencies to prepare contingency plans to be implemented in the event the budget was not passed by June 30, 1977. In response to the

Budget Secretary's Directive, the OA projected that it would have to reduce its budget for non-augmented bureaus,[15] which included BAA, by approximately $500,000. Defendant Wade, Secretary of the Office of Administration, decided that each bureau within OA would share equally in the projected budget reduction based on the percentage of OA's budget that the bureau received. A projected budget reduction was assigned for each bureau. In order to achieve the projected budget reduction, each bureau was ordered to cut back on spending immediately and, additionally, to prepare contingency plans for reducing personnel.

Defendant Harley prepared a contingency plan for achieving BAA's projected budget reduction of approximately $35,000. It called for the abolishment of the Attorney II position, which had been vacated on May 25, 1977, at a savings of $20,232.62, the furlough of the Assistant Director at a savings of $14,939.31, and savings from an employee on maternity leave of $5,663.50.[16] According to testimony of Terrence L. Spaar, former Executive Assistant to Defendant Wade, BAA's contingency plan was improper in that it overestimated the savings resulting from the proposed action because of a misapplication of two budgetary and personnel rules. First, vacant positions are budgeted only for one-half of the salary and benefits for the fiscal year. Thus, since the Attorney II slot was vacant and had been budgeted only at one-half the salary and benefits, its abolishment would have saved only $10,000 not $20,332.62 as suggested by Harley's contingency plan. Second, budget savings cannot include savings from individuals on maternity leave because benefits continue to be paid to those individuals and because they have a right to return at any time. Therefore, no

12. Defendant's Ex. 20–20a.

13. Stipulations 14–16.

14. Tr. 191.

15. Non-augmented bureaus are those bureaus within OA that were funded through OA's appropriation and not augmented by funds received by other agencies and departments. Tr. 384–85.

16. Tr. 383–90, 994–1000, Defendants' Ex. 4a, 4b; Plaintiff's Ex. 40.

savings could be relied on from an employee being on maternity leave and there could not be a savings of $5,663.50 as suggested by Harley.[17]

Although Defendant Harley's contingency plan recommended the abolishment of the Attorney II vacancy, Defendant Wade, Secretary of OA, instructed Harley that the Attorney II vacancy should not be abolished because it was considered to be important to the future operation of the affirmative action program.[18] This decision was made even though Administrative Circular No. 77–101 stated that vacancies should be abolished before employees were furloughed.[19] However, it was not absolutely necessary to abolish all vacancies before an employee could be furloughed. Agency heads had some discretion to keep specific vacancies that were critical to them. With respect to the Attorney II position, abolishment of that position, which was the only position within the Legal Division of BAA, would have meant the end of the Division. The reestablishment of the Legal Division when funds became available would be more difficult because of the procedures necessary to establish a division. Since the Defendants envisioned an important role for the Legal Division in the future, they believed it important not to abolish it.[20]

Pursuant to an executive order, furlough notices were sent in July 1977 to be effective in August 1977 to individuals identified in the contingency plans. In the first round of furloughs, only one BAA employee, Robert Ford, the Assistant Director, received a furlough notice as a result of the contingency plan. Reichman was not identified in the contingency plan prepared by Harley as an individual to be furloughed in the first round of furloughs. However, upon passage of the budget, the Governor ordered a recall of all first round furlough letters until the effect of the budget could be determined through the rebudget procedure. Thus, no one in the OA was actually furloughed as a result of this initial furlough notice.[21]

Upon rebudgeting, OA determined that it needed to reduce the budget of the non-augmented bureaus by $500,000, the same amount as had been projected prior to the first furlough round. The rebudget required that the staff of OA be reduced by 65, which included eliminating vacancies and otherwise removing positions from the OA payroll. As a result of the rebudget approximately 30 employees of OA's non-augmented Bureaus were furloughed. The remainder of the 65 reductions in complement was accomplished by abolishing vacancies. Of these thirty individuals who were "furloughed approximately twelve actually had their Commonwealth employment terminated; the other eighteen were removed from OA's payroll by retirements or transfers to other agencies.[22]

To effectuate the furloughs necessitated by the rebudget, Defendant Wade established a committee consisting of his Executive Assistant, the Director of the Bureau of Personnel, and the Director of the Bureau of Labor Relations. This committee was asked to review furlough plans submitted by each OA bureau to insure that the suggested furloughs were in line with the required fiscal reduction, the personnel rules and regulations, and labor laws. Once this committee reviewed the recommendations submitted by each bureau and approved them, recommendations were submitted to Secretary Wade. If he approved

17. Tr. 1334–36.

18. Tr. 471.

19. Administrative Circular No. 77–101 on "1977–78 Rebudget Instructions" issued August 25, 1977, provided:
"If reductions are necessary in personnel services, vacancies should be eliminated first and employee furloughs should be made only as a last resort or when desirable because of a shift in program priorities. . . . If any vacant or filled positions cannot be funded, they will be eliminated from the authorized complement and must be abolished immediately."
Plaintiff's Ex. 41.

20. Tr. 599–600.

21. Tr. 386–87, 1004–05.

22. Tr. 599–600.

the recommendations, they were put into effect. The recommendations made to Secretary Wade were in terms of job positions and classifications to be furloughed; there was no identification of the individuals who would be furloughed.[23]

As a result of the new budget, BAA was required to reduce its budget by $35,000, the same amount as the initial projected reduction. It was necessary to furlough more people in November to realize a $35,000 savings than BAA would have furloughed in July to realize the same savings because from July to November the individuals to be furloughed were being paid and thus payroll expenditures were above the monthly pro rata allotment for the fiscal year. This situation created a deficit for which there had to be compensation. Accordingly, BAA had to furlough individuals whose combined salaries and benefits equaled approximately $50,000 to $63,000.[24] Harley and Sawyer discussed several methods to achieve this reduction. One method of achieving the required cut was abolishing three clerical positions and one technical position but this would not have saved enough and would have greatly inhibited BAA's ability to perform its duties. A second method of achieving the required cut was to abolish higher paying positions. This method included abolishing the Chief of PTA position because of a shift in emphasis from the Program and Technical Assistance Division to the Planning, Research and Evaluation Division. This shift in emphasis from PTA to PRE started in the spring of 1977 after a review of the agencies' 1977 Affirmative Action Plans revealed common problems and the tremendous amounts of staff time used to manually calculate figures for utilization analysis, work which could be done by computer. A three year planning process which was ending at this time revealed that a much stronger research capability was needed to deal with problems identified in agencies' plans. This made it necessary to focus on programming and development of overall planning concepts which was done by PRE, rather than the information distribution and technical assistance which was the responsibility of PTA.[25] The shift in emphasis from PTA to PRE was reflected in an increase of staff provided to PRE; which included transferring Jean Becker from PTA to PRE in October of 1977.[26] With the shift in emphasis from the work done by the PTA Division to work done by the PRE Division, Harley felt that PTA could be reduced from a Division to a Unit and would not need a Chief. Thus, abolishing the position of Chief of PTA was a logical method for achieving a substantial savings to deal with the budget problem.[27]

In addition, Harley considered the furlough of Robert Ford, the Assistant Director, because he determined that Ford's furlough, along with Reichman's furlough would be least disruptive to BAA's implementing its duties since BAA was top-heavy in administrators. An Assistant Director was not necessary because BAA had not grown to the size originally planned. Although the original projected staff for BAA was 24, the Bureau had been able to fill only 14 positions. Furthermore, Ford himself had indicated he would voluntarily accept a furlough if it became necessary because he was seeking a job in Washington, D. C.[28]

Therefore, Harley ultimately recommended that Reichman and Ford be furloughed because their positions were the two positions whose elimination would least disrupt the future operation of BAA. Since the positions of Chief of PTA and Assistant Director were relatively high paying positions, Harley would only have to eliminate

23. Tr. 389–90.

24. Tr. 387–88, 1005–07.

25. Tr. 595–98, 1202–03.

26. Tr. 302–04, Defendants' Ex. 20a.

27. Tr. 231, 598. The position of Chief of PTA was abolished after Ms. Reichman was furloughed and the Division was reduced to a Unit. Tr. 311–12.

28. Tr. 230, 597, 604, 1617–19.

two employees rather than more lower level staff members.[29]

The savings realized by the furlough of Reichman was approximately $12,000 and the savings realized by the furlough of Ford was approximately $15,000 for a combined savings of $27,000. The remaining savings needed to realize a total savings of $35,000 was achieved by not filling the Attorney II vacancy which existed in BAA's complement. A savings of approximately $10,000 was realized by BAA from the Attorney II position because the position was "frozen", *i.e.* it was not permitted to be filled. This savings was realized even though the position was not abolished and no additional savings would have resulted even if the position had been abolished.[30]

To determine which particular individual should be furloughed when the position is one covered by civil service, the following non-discretionary procedure is used. The names of all individuals occupying the particular job classification from which a furlough should be made are obtained. A search is made for any individuals holding a status other than a regular permanent status, such as a probationary or provisional status. If there is an individual in probationary or provisional status that individual is furloughed first. If there are no individuals in a probationary or provisional status, the last regular performance evaluation of each individual in the job classification is used to place employees in quarters. Employees in the lowest quarter are furloughed first in reverse order of seniority. The practical effect of this requirement, if there are four or less people in the job classification, is that those individuals' performance evaluations are numerically ranked and the individuals are furloughed in order of their numerical ratings beginning with the person having the lowest rating.[31] Thus, when the PTA Division

Chief, which was classified as an EODS V, was identified as a slot to be abolished, any other individuals working in OA (the furlough unit) who were classified as EODS V's were compared. The only EODS V employed in the OA in addition to Ruth Reichman was Frederick Brooks who, like Reichman, had regular civil service status. There were no EODS V's who had probationary or provisional status.

A comparison of the last regular performance evaluation for Reichman and Brooks using the required numerical calculation, revealed that Reichman had the lower rating and, therefore, that she would be the one to be furloughed. It was not possible for Reichman to "bump down" to take the position of someone in an EODS IV or III classification because under civil service law, a civil service employee is entitled to move laterally within his or her classification level but not downward.[32]

In making the comparison between Reichman's performance evaluation and Brooks' performance evaluation, Michael Epoca, the Personnel Officer in OA, used Reichman's performance evaluation from October 1976 because the evaluation for October 1977 was not submitted to his office.[33] Robert Ford, as Reichman's immediate supervisor, was responsible for preparing her annual performance evaluation. Ford had prepared and signed a performance evaluation for Reichman on September 14, 1977.[34] Ford's immediate supervisor, Defendant Harley, had to review the performance evaluation and sign it as the reviewing officer before it was presented to Reichman. Upon receipt of the September 14, 1977 performance evaluation Harley signed it but decided to hold it rather than complete the processing of it because he felt that the narrative was too harsh and that Reichman would not want to have such a narrative in her first BAA evaluation. He

**29.** Tr. 228–30, 595–96.

**30.** Tr. 1008–10, 1336–37. Eventually, on September 1, 1978, when Harley left the BAA, the Attorney II position was abolished. Tr. 684.

**31.** Tr. 990–93.

**32.** Tr. 1001–16; Defendants' Ex. 30.

**33.** Defendants' Ex. 30.

**34.** Defendants' Ex. 31.

decided to hold it until he determined what action was appropriate because Ford was not willing to remove the harsh narrative.[35] Thus, as of the date of her furlough notice, October 11, 1977, no performance evaluation of Reichman completed by her BAA supervisor and reviewing officer had been received by OA's personnel office. Therefore, Plaintiff Reichman's last regular performance evaluation was completed in October of 1976 regarding her performance as a Planning Analyst for the Department of Environmental Resources ("DER"). It was the October 1976 DER evaluation which was used in calculating who was to be furloughed. Nevertheless, even if the performance evaluation completed by Ford and signed by Harley on September 14, 1977, had been used in calculating who would be furloughed, Reichman would still have been furloughed since the September 14, 1977 evaluation is substantially lower than Brooks' evaluation and substantially lower than Reichman's DER evaluation.[36]

After both Ford and Reichman received their October 11, 1977 furlough notices, Ford prepared a second performance evaluation for Reichman on October 17, 1977. Ford admitted that he prepared the second performance evaluation to give Reichman a competitive edge in the furlough situation.[37] The October 17, 1977 performance evaluation which Ford prepared for Reichman was substantially and unaccountably better than the first one he prepared on September 14, 1977, and did not contain the harsh narrative. Furthermore, in the September 14 evaluation, Ford rated Reichman as "good" in the overall evaluation but in the October 17 evaluation rated her as "excellent" in that category.[38] As Special Assistant to the Director, Sawyer had not observed anything in Reichman's job performance which would have accounted for a drastic improvement in her job rating in less than a month. Furthermore, in twenty-four years as a supervisor, Harley had never seen such an increase in performance in one month. As a result, Harley did not sign the second performance evaluation prepared by Ford because he did not consider it to be an accurate evaluation of Reichman's work for that period of time, since no supervisor could have seen such a vast improvement in performance in only one month.[39]

In addition to the substantial improvement in Reichman's performance evaluation, the relationship between Reichman and Ford became more friendly after they both received furlough notices. Numerous employees of BAA testified concerning the hostile relationship between Reichman and Ford before the second furlough notices were received and the friendly relationship after receipt of those notices. Specifically, before receiving her furlough notice, Reichman complained to Harley that Ford was disagreeable, did not accept recommendations, very often did not permit her to carry out her duties as she felt she should as Chief of PTA and made other general complaints. She also suggested more than once that Ford be fired and was very pleased when she heard Ford had been furloughed

---

**35.** Tr. 234, 1597–98. In the comment section of the performance evaluation, Ford wrote:

> The substance of your rating is that your performance meets acceptable standards. As a Division Chief, however, you have serious problems to correct in order to be effective both as a supervisor, and as a representative of this Bureau.
> Your greatest problem is your attitude more so than your ability in most respects. Your initial reaction to assignments and decisions is argumentative rather than acceptance and you frequently interrupt your supervisors before they can finish verbal instructions. Your attitude concerning the concept of affirmative action appears to be combative rather than cooperative and this style has

> had an adverse affect upon client agencies. I believe that you must develop a more positive attitude in your overall performance. We hope to assist you in this effort.
> Defendants' Ex. 31.

**36.** Tr. 1012–13. Reichman acknowledged that her DER performance evaluation was better than the "mediocre" September 14 performance evaluation prepared by Ford. Tr. 71.

**37.** Tr. 1594–97, 1608–09.

**38.** Compare Plaintiff's Ex. 29 with Defendants' Ex. 31.

**39.** Tr. 238–241, 613.

during the first round of furloughs.[40] Ford had also demonstrated his hostility toward Reichman prior to receiving his furlough notice in the second round of furloughs. Ford had told Harley on several occasions that he wanted to begin to keep a file to show poor performance on Reichman's part in order to build a case to fire her and tried to insert a derogatory memo into Reichman's personnel file, which Sawyer strongly opposed and which Harley refused to allow.[41] Yet, after Reichman and Ford received their furlough notices during the second round of furloughs, they became friends, spent a lot of time together and lunched together; things that they had not done before they received their furlough notices.[42]

While such evidence calls into question the reliability and objectivity of the October 14 performance evaluation of Reichman, civil service regulations also prevented the use of that evaluation. Pursuant to civil service regulations, an evaluation completed after the date the furlough notice was sent could not be used in determining who was to be furloughed. Thus, Ford's October 17, 1977 evaluation of Reichman could not be used in determining if Reichman would be furloughed because it was completed after the furlough notice was sent. If a performance evaluation completed after a notice of furlough had been sent were used to reconsider who should be furloughed, such actions would render the furlough process ineffective.[43] Consequently, Reichman's furlough became effective at the close of business on November 9, 1977.[44]

▪ Immediately before Reichman was furloughed, there were fifteen employees at BAA—nine Whites and six Blacks. On November 9, 1977, BAA had nine professional personnel, four of whom were Black and five of whom were Caucasian. After BAA furloughed two of its professional employees, Reichman and Ford, BAA had seven white employees and six black employees, which included three white and four black professional employees.[45] This action was taken even though BAA's Affirmative Ac-

40. Tr. 234–36, 611–12, 1089–91, 1220–22, 1357–58, 1384–86, 1401–03.

41. Tr. 236–37, 609–11, 1402.

42. Tr. 237, 612, 1091, 1222, 1385–86, 1402–03.

43. Tr. 1013–15.

44. Plaintiff's Ex. 26. When the furloughs were made, the priority of OA's personnel office was advising furloughed employees of their rights and benefits. Therefore, personnel vacancies were removed from the books sometime after the furloughs became effective when there was no longer any time pressure involved in completing the paperwork. This resulted in a vacancy, the statistical assistant, being shown on the books in October 1977, after furlough notices had been sent out even though it was slated to be abolished. Tr. 1314–15; Plaintiff's Ex. 60.

45. Stipulations 11–13. Tr. 56–57. Plaintiff's Ex. 1a, 1b. Although Plaintiff attempted to use these figures to demonstrate that the furlough of two Caucasians was statistically significant, we attach little significance to these statistics because of the small sample size. This decision is supported by the testimony of Bernard R. Siskin, Associate Professor of Statistics, Temple University. Tr. 901–03. Given a hypothetical group of nine professional employees consisting of five Whites and four Blacks, which is reduced to seven professionals consisting of three Whites and four Blacks, Siskin concluded that no one could statistically find that race was a factor in the decision of whom to furlough. "[I]n that situation, if you were to simply throw the nine names in a hat and put two out at random, the probability that both of them would have been White is 28 percent, which is a very reasonable probability. So that in itself is not evidence whatsoever that race was a factor in the process of selection." Tr. 902. While we recognize that statistics are sometimes relevant to prove or disprove individual disparate treatment claims, *Peters v. Jefferson Chemical Co.*, 516 F.2d 447, 450 (5th Cir. 1975), "[w]e caution only that statistics are not irrefutable; they come in infinite variety and, like any other kind of evidence, they may be rebutted. In short, their usefulness depends on all of the surrounding facts and circumstances." *Teamsters v. United States*, 431 U.S. 324, 339–40, 97 S.Ct. 1843, 1856, 52 L.Ed.2d 396 (1977). Small sample size or evidence showing that statistics for the general population do not accurately reflect the pool of qualified job applicants would detract from the value of such evidence. *Mayor of Philadelphia v. Educational Equality League*, 415 U.S. 605, 620–21 (1974); *Eubanks v. Pickens-Bond Construction Co.*, 635 F.2d 1341, 1350 (8th Cir. 1980). For example, in *Eubanks*, the court concluded that seven promotions within a period of three years did not lend itself to reliable statistical

tion Plan for 1977–78 listed two whites as target hires.[46] Furthermore, Management Directive No. 505.7 and Administrative Circular No. 77–77 required that agencies insure that the furlough of employees did not create a "disproportionate effect on progress achieved in the hiring, promotion, and retention of minorities and women".[47] While Defendant Harley considered the impact of furloughing Ruth Reichman and Robert Ford on BAA's Affirmative Action Plan and the Management Directive when he first considered recommending their furloughs, he concluded that their furloughs would not have a negative impact on BAA's overall affirmative action goals. Moreover, since the preservation of a functioning work unit was the primary concern in recommending furloughs, the impact of the furloughs in BAA's affirmative action plan was given secondary consideration.[48] After Reichman was furloughed on November 9, 1977, her position was abolished and PTA was reduced from a division to a unit. For four to six weeks after Reichman was furloughed, nobody was named head of the PTA unit. Instead, the PTA staff reported directly to Defendant Sawyer. When Sawyer found that he could not handle the PTA unit along with all of his other duties, Iris Cooley was named the supervisor of the PTA unit. While supervisor of the PTA unit, Cooley received no promotion and no out-of-class pay.[49]

Iris Cooley, a black female, was hired as an EODS III in the PTA Division, starting work on September 26, 1976. While Reichman was Director of PTA, Cooley was under Reichman's immediate supervision. Harley, however, had prepared and signed Cooley's first performance evaluation because Reichman had only been supervising Cooley for about one month and Harley believed that was not long enough for Reichman to properly evaluate Cooley's performance. In addition, in March of 1977, Harley had recommended Cooley for promotion from an EODS III to an EODS IV after she had been an EODS III for three years. This promotion was approved by Defendant Wade and became effective on March 31, 1977. After Cooley received her promotion, Reichman prepared Cooley's second performance evaluation because she was Cooley's immediate supervisor. This performance evaluation ranked Cooley substantially higher than the performance evaluation that Harley had prepared.[50] In the performance evaluation that she prepared for Cooley, Reichman made special mention of the fact that "[i]t is most important that we maintain working along lines of organizational structure, *and working with and through me as your immediate supervisor, has made for a smooth operation.*"[51]

Subsequently, in September of 1978, Cooley was named Special Assistant to the Di-

analysis. 635 F.2d at 1350. *See also Harper v. Trans World Airlines, Inc.,* 525 F.2d 409, 412 (8th Cir. 1975) (statistical analysis based upon five couples unpersuasive). Thus, we also find that the statistics presented by Plaintiff concerning BAA constituted too small a sample size for such statistics to serve as a predictive value or persuasive force.

**46.** Plaintiff's Ex. 10.

**47.** Plaintiff's Ex. 38, 39.

**48.** Tr. 227, 241–43, 601–03.

**49.** Tr. 231–32, 605–06. A "director" is a higher rank than a "supervisor" and a "division" is a more important component in an agency than a "unit". Tr. 311, 424.

**50.** Tr. 58–59, 308–09, 361, 474–76; Plaintiff's Ex. 1a, 1b; Defendants' Ex. 19, 20a, 21.

**51.** Defendants' Ex. 21 (emphasis added). In addition, Reichman evaluated Cooley as "excellent" in 9 out of 10 categories of performance. This rating was buttressed by the following written comments:

Your sharing of information, thought provoking questions, and overall initiative had made you a vital employe of this bureau. During my absence, you continued to function in a highly professional manner, even in face of added responsibilities. Our new quarters have provided an opportunity to organize our materials and I would like to suggest you arrange said materials so that they are retrievable in your absence. You are undoubtedly committed to the goals of affirmative action and I look forward to a long and successful relationship with you as part of our team.

This performance evaluation conflicts with Reichman's testimony. She explained that:

rector. As a consequence of her assignment as the Special Assistant, which is a higher position than an EODS IV, Cooley was paid out of grade for that time period.[52] Yet, even before Plaintiff was furloughed, Harley had proposed that Cooley be Chief of PTA rather than Reichman. In a September 15, 1977 memorandum to Secretary Wade, Harley recommended that Reichman be reassigned from her position in BAA to work in another office, under Churchill Kohlman. Kohlman had special responsibilities in the Governor's Personnel Office for affirmative action in the selection of non-civil service employees for Commonwealth employment. Harley testified that he made this request because Kohlman had approached him and indicated an interest in having Reichman on his staff.[53]

### B. Investigation of the Southeast Regional Office of the Department of Public Welfare

During the summer of 1977, organizations representing various ethnic groups ex-

pressed their concerns about the affirmative action policies, programs and forms administered by Pennsylvania agencies to Lieutenant Governor Kline. As a result of that conference, Defendants Harley and Sawyer met with representatives of the Polish-American Affairs Council, the Pennsylvania Order of the Sons of Italy (Grand Lodge), and the American Jewish Committee (Philadelphia Chapter) (AJC) on July 7, 1977, in Philadelphia. As a follow-up to the July 7, 1977 meeting, those Defendants also met with representatives of the AJC and several employees of the Department of Public Welfare, Southeast Region (SEDPW) on July 19, 1977, in Philadelphia.[54] At these meetings, representatives of the ethnic groups expressed their complaints regarding abuse of affirmative action programs and policies and made specific allegations of discrimination against Caucasians by the Southeast Regional Office of the Department of Public Welfare.[55] In response, BAA attempted to resolve these

---

The original evaluation I prepared was different from the one you see here. And I had a comment on the bottom about Iris working around me and over me but not through me with Dan Harley and Dan Sawyer. And it was still a very good evaluation that I gave Iris because I felt she was a very good worker and deserved it. But Iris said she refused to sign it and she would take this evaluation to Dan Harley unless I changed it.

And at that point since I had had problems with Dan Harley a few months before, he called to say why was I dragging my feet on Lang Lewis' promotion and did I have a problem.

And when I had questioned another performance of Iris, he said the only way he would change it was upward, I didn't want any more conflict with Mr. Harley. And so I did tell Iris that I would rewrite it. And I changed it and I couched my wording at the bottom, I still left something in. And I put in: "It is most important that we maintain working along lines of organizational structure, and working with and through me as your immediate supervisor, has made for a smooth operation."

Tr. 1626–27.

52. Tr. 605–07, 1023–24; Plaintiff's Ex. 62.

53. Tr. 299–301; Plaintiff's Ex. 42.

54. Stipulation 17.

55. These concerns, as summarized by representatives of the ethnic organizations, were, as follows:

1) [T]hat all affirmative action programs be evaluated for impact annually on an agency-by-agency and department-by-department basis to be strengthened, modified or terminated based upon demonstrable need and with criteria for same;

2) that compliance certificates, such as PW–378, which requires supervisors to "justify" all non-minority hires and promotions be eliminated except in cases of demonstrated recalcitrance;

3) that race codes like "white" be expanded, that underutilized ethnic groups be included in the Bureau's future "underutilization research" and that ethnic organizations be consulted in the planning and development of programs to broaden the Bureau's present orientation beyond that of blacks and women, objectives which we support. In this respect, we offer the resources, including research facilities of our groups as a means of being helpful here;

4) that some mechanism be created to remedy the problem of a number of white employees in the Southeastern Regional office of the Pennsylvania Department of Public Welfare who feel themselves to be locked out of promotions. Toward this end, we have scheduled a meeting in Philadelphia for the Bureau with representative individuals here to dem-

charges by directing Louise Oncley to do a fresh analysis of the SEDPW employment statistics to see if they indicated possible discrimination and having Ruth Reichman, BAA liaison with DPW, tell Colonel Johnson, DPW's Affirmative Action Officer, to investigate the situation in SEDPW. Oncley performed a fresh utilization analysis of the employment figures in the SEDPW Regional Office. This work force analysis showed that projected hires under the SEDPW Regional Office affirmative action plan were for 58 percent white males, 33 percent black males, and 8 percent white females.[56] A work force analysis for the entire region, however, indicated that although black employees predominated in the clerical and nonprofessional jobs, management positions were primarily held by white employees.[57]

Plaintiff Reichman, in her role as Chief of the PTA Division, had no responsibility to investigate complaints of discrimination. PTA's duties in dealing with complaints in accordance with the Division's "Mission and Functions Statement" are limited to advising and providing state agencies or employees with consultation regarding specific grievances.[58] Thus, Reichman's only assignment concerning the questions of the ethnic agencies was to contact the appropriate DPW staff, communicate the ethnic organization's concerns and indicate that BAA was requesting that a special review be made regarding those concerns and that the results of the investigation be reported back to BAA.[59]

In an August 24, 1977 memorandum, Reichman informed Harley and Sawyer that she had discussed the complaints about

SEDPW with Colonel Johnson and outlined the actions that Colonel Johnson would be taking to pursue the matter. Subsequently, on September 1, 1977, Reichman informed them of the results of the actions that Colonel Johnson had taken and his conclusion that DPW was "in the clear" and that the "entire issue was a political ploy." Reichman herself concluded that SEDPW did not suffer from utilization problems in a memorandum written on September 27, 1977.[60] Defendants Harley, Sawyer and Wade took steps to inform Lieutenant Governor Kline and the members of the ethnic organizations of the results of their investigations. On October 11, 1977, Harley wrote to the Regional Director of the American Jewish Committee, one of the concerned ethnic groups, and reported:

> We have done a fresh analysis of the Department of Public Welfare Regional Office in Philadelphia and have found that while doubtlessly some gains have been made by minorities and women in that office, there still exists some underutilization which we hope will be addressed in an amicable way. This should not be construed as meaning that we believe that the other concerns regarding that office are invalid. At this point, most are still under investigation.[61]

Other than Reichman's allegations, no probative evidence was introduced that demonstrated Defendants intended to furlough Plaintiff because of her role in the investigation of SEDPW or to impede the performance of her job in any other manner. Indeed, BAA's investigation of the ethnic organizations' concerns continued after Reichman's furlough until April of 1978

---

onstrate specific problems they face in an *effort to enlist your assistance in adjudicating* such grievances.
Plaintiff's Ex. 14. *See also* Plaintiff's Ex. 13, 15.

**56.** Defendants' Ex. 24–25. The court notes that the affirmative action plan for DPW was recommended for approval by Plaintiff Reichman. Tr. 1289. Furthermore, although Reichman did not receive a copy of the new utilization analysis prepared by Oncley, Reichman was in the hospital at that time for back surgery. Tr. 1213.

**57.** Tr. 1217–18.

**58.** Plaintiff's Ex. 2, ¶ 8.

**59.** Tr. 271–72.

**60.** Plaintiff's Ex. 16, 17, 19b.

**61.** Plaintiff's Ex. 19a; Defendants' Ex. 15; Tr. 278–79.

when the ethnic groups filed an EEOC complaint against BAA.[62]

### C. Reichman's Claims of Sexual Harassment and Religious Discrimination

Substantial testimony was adduced to show that prior to receiving her furlough notice, Reichman behaved in a flirtatious manner toward Defendant Harley. In the office, she frequently complimented Harley on his appearance, straightened his tie, moved her body in a provocative manner around Harley, and otherwise acted unprofessionally. Despite his repeated refusals, Reichman asked Harley to have dinner at her house several times. During that period of time, Reichman was visibly upset that Harley declined her invitations. Moreover, Harley engaged in no conduct to encourage Reichman's flirtatious behavior.[63]

On Saturday, March 19, 1977, Reichman, Oncley, Cooley, and Defendants Harley and Sawyer attended a conference in Philadelphia. Prior to the meeting, Reichman asked Freda Keane, secretary for the PTA Division, to make hotel reservations for her in Philadelphia for the nights of March 18 and 19. Oncley and Cooley, however, drove to Philadelphia from Harrisburg on March 19 and returned on the same day. After the conference, Sawyer suggested that Reichman join Harley and himself for dinner, an invitation which she accepted. There was dancing at the restaurant where they dined and Harley danced with Reichman. After dinner, Reichman suggested that they go to Fran O'Brien's, a night spot a few blocks from the restaurant.

When they got to Fran O'Brien's, Sawyer felt ill and went back to his hotel leaving Harley and Reichman at Fran O'Brien's. Harley and Reichman each had several drinks and continued to dance together. Subsequently, Harley walked Reichman to her car in the motel parking lot across the street from where she was staying. Harley testified that she then gave him a goodnight kiss to which he did not respond other than to say goodnight. Reichman, however, asserted that Harley forced a kiss upon her and insisted that he should accompany her back to her motel.[64] Even assuming that Harley initiated the kiss, the court finds that his actions were not undesired nor unwanted. Moreover, Reichman's behavior toward Harley was the same after March 19, 1977, as it was before that date. She continued to invite him to her house for dinner. It was not until after Reichman received her furlough notice that she changed her attitude toward Harley and became openly hostile. At that time, she indicated on several occasions that she would get Harley and destroy BAA.[65]

Reichman's claim of religious discrimination is based upon statements made by Defendants Harley and Sawyer and the scheduling of a meeting on Yom Kippur, September 22, 1977. The alleged statements, most of which Harley and Sawyer admittedly made, generally concerned various political issues. Harley and Sawyer expressed their opinions concerning the Arab-Israeli conflict and Menachim Begin, particularly his terrorist activities in 1947. Such views were similar to those expressed by certain news media during that time period. Reichman took issue with such comments. In addition, Harley acknowledged his disagreement with the position taken by various ethnic organizations in the *Bakke* case in opposition to affirmative action programs; a view adopted by other employees at BAA. Indeed, this topic was discussed at BAA staff meetings. While Harley knew that Reichman was Jewish, he did not assume that she supported the position of the American Jewish Committee regarding *Bakke*.[66]

On September 15, 1977, Defendant Harley sent a memorandum to all BAA staff members in which he officially informed

---

62. Defendants' Ex. 20c, 27, 28; Tr. 584–86.

63. Tr. 1076–78, 1188–89, 1382–83, 1803–04.

64. Tr. 31–33, 295–98, 625–28, 1085, 1111–12, 1821.

65. Tr. 1077–80, 1189–91, 1383–84.

66. Tr. 108–14, 281–82, 614–15, 884–88, 1195–96.

them of the monthly meetings to be held by the Affirmative Action Task Force. Harley emphasized that "[a]ll technical staff will be expected to attend all of these Task Force meetings." The September meeting was scheduled for September 22, 1977, the Jewish holiday of Yom Kippur.[67] This meeting was for BAA employees and the Affirmative Action Congress, which was composed of the affirmative action officers in the thirty-eight state departments and agencies.[68]

Although it is unclear whether Harley knew that September 22 was Yom Kippur, when he prepared the memorandum,[69] Reichman did advise Harley prior to the meeting that September 22 was a Jewish holiday and requested that the meeting be rescheduled. Harley was surprised at this request since he was not aware that Reichman observed Jewish holidays or practiced the Jewish religion because she had not requested leave for Rosh Hashanah, which occurs the ninth and tenth days before Yom Kippur. Harley, however, did not believe that the meeting should be delayed because of some serious concerns and it would be difficult to reschedule a meeting. Furthermore, although Harley expected staff members to attend such meetings, he recognized planned vacations, religious holidays, and emergencies as valid reasons for missing the meetings.[70] Indeed, Reichman's request for leave on September 22, 1977, was approved and she did not attend the meeting. Nevertheless, minutes of the meeting were prepared and available for review by employees of BAA. Moreover, other BAA employees occasionally missed Task Force meetings without any repercussions or resulting disciplinary action.[71]

### D. Claims of Defamation Against Defendant Harley Individually

*1. Harley's Memorandum of November 10, 1977.*—After Reichman received her furlough notice, Defendant Harley heard that Reichman was making negative accusations and threats against Harley and BAA. Indeed, she directly told Harley "[t]hat if it's the last thing I do in life, I'm going to destroy you and this Bureau [BAA]."[72] Accordingly, on November 10, 1977, Harley contacted John Raup, the Commonwealth attorney who previously provided BAA with legal counsel, and explained the situation to him. Following the conversation, Harley dictated a memorandum to Phyllis Riddle based upon his discussion with Raup. Upon Harley's instructions, Riddle took the finished memorandum to Raup for his review and approval before the memorandum was sent. Raup read the memorandum in Riddle's presence and approved its transmittal.[73] Upon Raup's legal advice, Harley sent the memorandum to at least 72 persons in the agencies with which BAA had contact. The memorandum stated:

> This is to inform you that Ms. Ruth Reichman is no longer a member of the staff of the Bureau of Affirmative Action. This was effective at the close of business on 11/9/77. There should be no official discussions regarding the Affirmative Action Program and the provision of information and records to Ms. Reichman in the future. You should record visits made by Ms. Reichman and keep a record of any discussions taking place with you or members of your staff. Please provide me with a copy of a record of all discussions that you and your staff have with Ms. Reichman after 11/9/77.[74]

67. Plaintiff's Ex. 50.

68. Tr. 282–83.

69. Compare Tr. 115 to Tr. 283.

70. Tr. 283–85, 1107, 1386–87. While Reichman indicated that she did not take leave for Rosh Hashanah because she had used most of her annual leave time, her records indicate that as of September 13, 1977, she had 98.5 hours (approximately 13 days) of annual leave to her credit. Defendants' Ex. 8; Tr. 1623–24.

71. Plaintiff's Ex. 24; Defendants' Ex. 8; Tr. 78–80, 286, 618–19, 1222–23.

72. Tr. 258–59, 1078–79, 1190–93, 1384, 1400–01, 1413.

73. Tr. 247, 291, 1409–11, 1428–30.

74. Plaintiff's Ex. 51a–51 11.

Harley wanted these agencies to know that Reichman was no longer employed at BAA and that she was not representing BAA in any of her contacts with these agencies. Additionally, Harley needed to know what Reichman was saying about BAA so that he could correct any false image created or inaccurate information submitted by Reichman.[75] Although Defendant Sawyer did not assist in the preparation of the memorandum, he was aware that the memorandum was being sent and took no action to stop it.[76] In any event, Reichman presented no evidence indicating that this memorandum of November 10, 1977, was interpreted by any recipient to defame Reichman or to harm her reputation. The only witness who testified on Plaintiff's behalf about the effect of the memorandum stated that he did not know what it meant except that Reichman was furloughed on November 9, 1977.[77]

*2. Statements Concerning Reichman's Morality.*—Ernest Conley, administrator of the affirmative action program for the Bureau of Vocational Rehabilitation ("BVR"), testified that Harley told him that Harley could have had sexual relations with Reichman and that Harley furloughed Reichman because she was too active in Jewish affairs. Conley, however, was not an unbiased witness. When Reichman served as the BAA liaison to BVR, Reichman and Conley became good friends.[78] Moreover, Conley gave special treatment to Reichman, which he did not provide to other individuals. These favors included introducing her to his staff, calling her on the telephone and singing "Happy Birthday," escorting her to the elevator when she would leave, allowing her extensive use of the office phone although other non-staff members, including

Kenneth O'Vell, Reichman's successor as BAA liaison to BVR, were prohibited from using it, and allowing her to use his personal phone. Furthermore, Reichman approved BVR's affirmative action plan even though Conley testified that it was not in final form and lacked short term goals. While Conley found that Reichman's performance with BVR was outstanding, O'Vell worked over a month making significant changes in BVR's affirmative action plan as initially approved by Reichman.[79]

In contrast, Defendant Harley denied making any statement that he could have gone to bed with Reichman or that he fired her because of her active involvement with Jewish organizations. In the office, Harley never said or did anything that made the BAA staff think he was making sexual advances or sexually harassing any of the women at BAA.[80]

## III. DISCUSSION

### A. Reichman's Standing To Raise Pattern and Practice Claim

In Count I of the complaint, Reichman charges that Defendants are engaged in a continuing pattern and practice of discrimination based upon race and color in violation of Title VII of the Civil Rights Act of 1964. The specific policies and practices which Reichman has challenged are BAA's development and approval of affirmative action plans used by Commonwealth agencies, the exclusion of certain racial and ethnic groups from such affirmative action plans, the application of utilization analysis to Commonwealth employment figures, and the use of affirmative action certificates. Although such practices may violate the provisions of Title VII,[81] we do not reach

---

75. Tr. 104–05; 476–77.

76. Tr. 545–46.

77. Tr. 86–87.

78. Tr. 88–89, 92.

79. Tr. 85–86, 92–94, 1095–97, 1378–82, 1434–41, 1567–74, 1804–05.

80. Tr. 102–04, 622–23, 1081, 1359–60, 1387, 1401.

81. The court emphasizes that such practices are not per se violations of Title VII. Voluntary affirmative action plans are a recognized and permitted method of eliminating past discriminatory action. *United Steelworkers of America v. Weber*, 443 U.S. 193, 204, 99 S.Ct. 2721, 2727, 61 L.Ed.2d 480 (1979); *Chmill v. City of Pittsburgh*, 488 Pa. 470, 412 A.2d 860 (1980). Furthermore, an employer need not demonstrate actual discrimination on his own part before adopting such a plan but can rely

the merits of this claim since Reichman lacks standing to present such claims.

▪ With respect to questions of standing, the Third Circuit Court of Appeals has announced:

Broadly put, the question raised by a dismissal for want of standing is "whether the litigant is entitled to have the court decide the merits" of the legal controversy before it. *Warth v. Seldin*, 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). *This inquiry normally turns* not upon "the fitness for adjudication ... of the legal questions" at issue, but rather *on "the nature and sufficiency of the litigant's concern with the subject matter of the litigation."*

*Frissell v. Rizzo*, 597 F.2d 840, 843 (3d Cir.) (emphasis added), *cert. denied*, 444 U.S. 841, 100 S.Ct. 82, 62 L.Ed.2d 54 (1979). To determine whether a party has standing, the court must initially require the party to "demonstrate that he, himself, has been exposed to some actual or threatened injury" and then determine "whether the claim is barred by nonconstitutional, prudential limitations on the exercise of its jurisdiction." *Id., citing, Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 2204–05 (1975) ("A federal court's jurisdiction therefore can be invoked only when the plaintiff himself has suffered 'some threatened or actual injury resulting from the putatively illegal action....'"). In this action, Reichman has failed to demonstrate any actual or threatened harm from BAA's approval of affirmative action plans used in the Commonwealth, the adoption of utilization analysis, or the use of affirmative action certificates.

Reichman produced *no* evidence showing how her furlough or any other alleged injury was the result of these practices and policies. Indeed, Reichman was initially hired at BAA despite these practices and subsequently reinstated by the Department of Public Welfare, effective January 30, 1978, within three months of her furlough from BAA,[82] in spite of the continued use of such practices.

In *Mixon v. Gray Drug Stores, Inc.*, 81 F.R.D. 413 (N.D.Ohio 1978), the court concluded that an individual who was actually hired by a company had no standing to challenge the company's hiring practices. *Id.* at 414, *citing, Freeman v. Motor Convoy, Inc.*, 409 F.Supp. 1100, 1113 (N.D.Ga.1976) ("[P]laintiffs who are present employees and who were never denied employment on account of their race do not have standing to represent a class composed of job applicants who were never hired in any capacity by the defendant."). Similarly, in *Wade v. New York Telephone Co.*, 500 F.Supp. 1170 (S.D.N.Y.1980), the court maintained:

Initially, it is to be noted that whereas the complaint challenges the company's hiring, promotion and termination practices, it does not allege that plaintiff was herself aggrieved by defendant's failure to hire or promote her. *Plaintiff has standing to challenge only the policies of which she was allegedly the victim-the company's discharge procedures.*

*Id.* at 1179 (emphasis added). *See also Lewis v. Bethlehem Steel Corp.*, 440 F.Supp. 949, 969 (D.Md.1977) (employee lacked standing to challenge the discriminatory ef-

---

upon "the existence of a history of racial discrimination in the relevant occupation or profession at large." *Cohen v. Community College of Philadelphia*, 484 F.Supp. 411, 434 (E.D.Pa. 1980). Accordingly, BAA and other Commonwealth agencies could rely upon such reports as "Get It Together: Discrimination, Racism and Sexism in State Employment and Recommendations for Change," which concluded that:

There are many evidences of racism, sexism, and other forms of discrimination in the current systems of personnel administration in the Commonwealth of Pennsylvania. White males hold practically all high paying and

policy making positions. Women and minorities are generally employed in the lowest paying jobs.

Defendants' Ex. 12, p.1 (footnotes omitted). In addition, a computerized system of analyzing minority utilization is not prohibited unless it results in an improper quota system. Finally, the use of affirmative action certificates for the purpose of maintaining employment statistics is permissible. *See, e.g., Lee v. Walnut Garden Apartments, Inc.*, 479 Pa. 142, 387 A.2d 875 (1978).

82. Defendants' Ex. 11.

fect of craft determination tests that he did not fail or was not deterred from taking).[83]

■ Reichman, however, contends that since she was responsible for implementing these allegedly discriminatory practices, she is legally liable for any discriminatory effects of such practices and policies. *Lewis v. Hyland*, 554 F.2d 93 (3d Cir.), *cert. denied*, 434 U.S. 931, 98 S.Ct. 419, 54 L.Ed.2d 291 (1977). She thus claims that she has "a right to know if she has been required to implement discriminatory policies."[84] Even if standing can be based on such a unique concept, Reichman has failed to show that her employment actions have resulted in *actual* or *threatened* legal action against her.[85] In the absence of such proof, Reichman demonstrates no injury.

While this court recognizes that the primary burden of enforcing Title VII actions rests with private individuals, *Romasanta v. United Airlines, Inc.*, 537 F.2d 915, 918 (7th Cir. 1976), *aff'd sub nom., United Airlines, Inc. v. McDonald*, 432 U.S. 385, 97 S.Ct. 2464, 53 L.Ed.2d 423 (1977), we cannot overlook constitutionally mandated requirements for standing. Accordingly, we dismiss Count I of the complaint for lack of standing.

For similar reasons, we must deny Reichman's motion for certification of a Rule 23(b)(2) class and to amend complaint to conform to the evidence. Specifically, Reichman seeks to represent the class of

"Polish-Americans, Jewish-Americans and other racial and ethnic groups not designated by defendants for the purpose of utilization analysis or preferential affirmative action who have sought employment or may seek employment in the future with the Commonwealth of Pennsylvania and who are adversely affected by defendants' affirmative action policies and practices." Although this motion should be denied as untimely, the court also finds that Reichman has failed to satisfy the requirements of Federal Rule of Civil Procedure 23.

■ Under Rule 23(c)(1), the district court is required to make a class determination "[a]s soon as practicable after the commencement of an action brought as a class action." In accordance with Rule 83 of the Federal Rules of Civil Procedure, this District has established time limitations upon the filing of a motion for class certification. Pursuant to Local Rule of Court 701.07(c),

Within ninety (90) days after filing of a complaint in a class action, unless this period is extended on motion for good cause appearing, the plaintiff shall move for a determination under subdivision (c)(1) of Fed.R.Civ.P. 23, as to whether the case is to be maintained as a class action.[86]

In this action, Reichman did not move for a class certification until after the trial on the merits. Clearly, this delay violated the ninety-day requirement.[87] We thus con-

---

**83.** Plaintiff has not asserted standing on the basis of a "working environment" theory. Under such a theory, courts have granted standing to plaintiffs who allege that the discriminatory practices of their employers have forced them to work in a discriminatory environment. *Waters v. Heublein, Inc.*, 547 F.2d 466 (9th Cir.), *cert. denied*, 433 U.S. 915, 97 S.Ct. 2988, 53 L.Ed.2d 1100 (1976); *Bartelson v. Dean Witter & Co.*, 86 F.R.D. 657, 665 (E.D.Pa.1980). In any event, the evidence presented at trial would fail to support such a theory of standing.

**84.** Plaintiff's post-trial brief in support of her proposed findings of fact and conclusions of law, doc. no. 128, p.3.

**85.** In *O'Shea v. Littleton*, 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974), the Supreme Court explained that "[a]bstract injury is not enough .... The injury or threat of injury must be

both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 494, 94 S.Ct. at 675.

**86.** Local Rule of Court 701.07(c) was readopted as Local Rule of Court 807.3, effective March 1, 1981

**87.** The court also points out that Reichman failed to comply with Local Rule of Court 701.07(b) which requires that in any case sought to be maintained as a class action:

The complaint shall contain under a separate heading, styled "Class Action Allegations":

(a) A reference to the portion or portions of Fed.R.Civ.P. 23, under which it is claimed that the suit is properly maintainable as a class action.

(b) Appropriate allegations thought to justify such claim, including, but not necessarily limited to:

clude that the failure to abide by this Local Rule of Court must result in the denial of Reichman's motion. *Kushner v. Winterthur Swiss Insurance Co.*, 620 F.2d 404, 407–08 (3d Cir. 1980) (appeal dismissed for failure to file an appendix that conformed to court rule).[88]

■ Even if Reichman had filed a timely motion for class certification, the court has determined that she has failed to satisfy the requirements of Rule 23(a). That Rule provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

We are persuaded that the claims of Reichman are *not* typical of the claims of the

> (1) The size (or approximate size) and definition of the alleged class,
> (2) The basis upon which the plaintiff (or plaintiffs) claims
> (A) To be an adequate representative of the class, or
> (B) If the class is comprised of defendants, that those named as parties are adequate representatives of the class,
> (3) The alleged questions of law and fact claimed to be common to the class, and
> (4) In actions claimed to be maintainable as class actions under subdivisions (b)(3) of Fed.R.Civ.P. 23, allegations thought to support the findings required by that subdivision.
> This Rule was readopted as Local Rule of Court 807.2, effective March 1, 1981.

**88.** Reichman relies upon *Senter v. General Motors Corp.*, 532 F.2d 511, 520–22 (6th Cir.), *cert. denied*, 429 U.S. 870, 97 S.Ct. 182, 50 L.Ed.2d 150 (1976), to support her proposition that the court can certify a Rule 23(b)(2) class at any point during the legal proceedings including in its decision on the merits. Initially, we distinguish *Senter* on the basis that unlike this District, there is no indication that local rules in the district court in which *Senter* went to trial imposed time limitations upon a party seeking class certification. Furthermore, in *Senter*, the court stressed that "there is no question but that the suit was filed as a class action and it proceeded to trial as a class action" and that

purported class on the basis that we determined that Reichman lacked standing to challenge the practices and policies of BAA regarding affirmative action programs, utilization analysis, and affirmative action certificates.[89] Reichman has not shown how her furlough was the consequence of these allegedly discriminatory practices. Moreover, Reichman seeks to represent a class of people who have sought or may seek employment with the Commonwealth and who are adversely affected by Defendants' practices. Yet, Reichman has not claimed or proved that she sought employment and was adversely affected by Defendants' policies and practices. Indeed, as we pointed out, Reichman was hired by BAA and subsequently hired by the Department of Public Welfare in spite of the existence of these allegedly discriminatory practices.

In *Scott v. University of Delaware*, 601 F.2d 76 (3d Cir.), *cert. denied*, 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979), the Court of Appeals in examining the effect of *East Texas Motor Freight, Inc. v. Rodri-*

"no one was misled as to the class nature of the action." *Id.* at 521–22. In the case at bar, the complaint contains no class allegations of any type and the trial was not conducted or perceived by this court as a class action. If the court would now certify a class, Defendants would be unfairly prejudiced since their preparation for and presentation at trial was not in response to class allegations. *Nance v. Union Carbide Corp., Consumers Product Division*, 540 F.2d 718, 722–25 (4th Cir. 1976), *vacated on other grounds*, 431 U.S. 952, 97 S.Ct. 2671, 53 L.Ed.2d 268 (1977).

**89.** Attached to Reichman's motion for class certification and supporting brief, doc. no. 129, is an affidavit by Murray Friedman, Regional Director of the American Jewish Committee, Philadelphia Chapter. Mr. Friedman states that "we relied on being adequately represented by Ruth Reichman who has been prosecuting the issues we raised and is a member of the American Jewish Committee Philadelphia Chapter." The court cannot rely upon such statements in ruling upon whether Reichman's claims are typical of the class claims since the American Jewish Committee is not a member of the class nor was any evidence presented showing that any member of the organization was denied employment because of BAA's policies and practices.

*guez,* 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), held:

> [I]n this case, Scott concedes that he personally suffered no discrimination when he was hired. Since he was not injured by any allegedly discriminatory hiring practices, it is doubtful after *East Texas Motor Freight* that he can lead a class challenging the University's hiring practices.

*Id.* 601 F.2d at 87. In a footnote, the court further observes that "[s]everal courts have held that a named plaintiff who challenges a defendant's discriminatory *promotion* practices may not represent a class contesting the defendant's *hiring* practices because these claims are insufficiently similar." *Id.* at 87, n.23 (emphasis original). *See Abron v. Black & Decker (U.S.) Inc.,* 654 F.2d 951, 954–55 (4th Cir. 1981). This result is supported by established legal principles

> *A plaintiff may not use the procedural device of a class action to boot strap himself into standing he lacks under the express terms of the substantive law.* It must be noted that the question of standing is totally separate and distinct from the question of plaintiff's right to represent a purported class under Rule 23. While standing to sue is an essential prerequisite to maintaining an action, whether in one's own right or as a representative of a class, the issues are not convertible. Standing to sue is an essential threshold which must be crossed before any determination as to class representation under Rule 23 can be made.

*Weiner v. Bank of King of Prussia,* 358 F.Supp. 684, 694 (E.D.Pa.1973) (emphasis added).

 Finally, the court questions whether Reichman can "fairly and adequately protect the interests of the class."

In resolving a similar issue, the Supreme Court reasoned:

> Apart from the named plaintiffs' evident lack of class membership, the record before the Court of Appeals disclosed at least two other strong indications that they would not "fairly and adequately protect the interests of the class." One was their failure to move for class certification prior to trial. Even assuming, as a number of courts have held, that a district judge has an obligation on his own motion to determine whether an action shall proceed as a class action, the named plaintiffs' failure to protect the interests of class members by moving for certification surely bears strongly on the adequacy of the representation that those class members might expect to receive.
>
> . . . . .
>
> We are not unaware that suits alleging racial or ethnic discrimination are often by their very nature class suits, involving classwide wrongs. Common questions of law or fact are typically present. But careful attention to the requirements of Fed.Rule Civ.Proc. 23 remains nonetheless indispensable. The mere fact that a complaint alleges racial or ethnic discrimination does not in itself ensure that the party who has brought the lawsuit will be an adequate representative of those who may have been the real victims of that discrimination.

*East Texas Motor Freight, Inc. v. Rodriguez,* 431 U.S. at 404–06, 97 S.Ct. at 1897–98 (footnote and citations omitted). This court likewise concludes that Reichman's failure to seek class certification until after trial on the merits demonstrates that Reichman would be an inadequate class representative.[90]

---

**90.** Reichman also failed to satisfy her burden of proof with respect to the numerosity requirement of Rule 23(a). In *Rex v. Owens ex rel. Oklahoma,* 585 F.2d 432 (10th Cir. 1978), the court ruled that

> In class action suits there must be presented some evidence of established, ascertainable numbers constituting the class in order to satisfy even the most liberal interpretation of the numerosity requirement. There is, how-

ever, no set formula to determine if the class is so numerous that it should be so certified. The determination is to be made in the particular circumstances of the case. The duty of establishing those particular circumstances rests with the party who asserts the existence of the class and that party must produce some evidence or otherwise establish by reasonable estimate the number of class members who may be involved.

## B. Racial Discrimination Claim

Having disposed of Reichman's pattern and practice claim, the court now turns to her remaining claims. First, Reichman contends that she was discriminatorily discharged on the basis of her race and color. In a Title VII claim such as this one, Reichman's burden of proof is governed by the holding in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). This court examined the impact of *Burdine* in *Allesberry v. Pennsylvania*, Civil Action No. 78–433 (M.D.Pa., filed June 30, 1981), and outlined *Burdine*, as follows:

> Recently, in *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 [101 S.Ct. 1089, 67 L.Ed.2d 207] (1981), the Supreme Court clarified "the basic allocation of burdens and order of presentation of proof in a Title VII case alleging discriminatory treatment," as set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 [93 S.Ct. 1817, 36 L.Ed.2d 668] (1973). In *Burdine*, the Court summarized the holding in *McDonnell Douglas*:
>
> > First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.
>
> 450 U.S. at 252–53 [101 S.Ct. at 1093–94] (citations omitted). The Court, however, further explained that although intermediate evidentiary burdens exist, "[t]he ul-

timate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.* at 253, 101 S.Ct. at 1094.

Slip. op. at 12–13 (footnote omitted). *See also Croker v. Boeing Co.*, 662 F.2d 975, 990–91 (3d Cir. 1981).

 The facts necessary to establish a prima facie case of racial discrimination are flexible in Title VII cases and will vary to reflect the differing circumstances of each situation. Applying the model of a prima facie case formulated in *McDonnell Douglas* to the facts of this action, we believe that Reichman must show by a preponderance of the evidence that (i) she was a White; (ii) she was qualified for the job and satisfied the normal requirements of her employment; (iii) despite her qualifications and performance, she was discharged; and (iv) the employer employed a non-White having qualifications no better than Reichman's qualifications in a position comparable to Reichman's former position. 411 U.S. at 802, 93 S.Ct. at 1824; *Marks v. Prattco, Inc.*, 607 F.2d 1153, 1155 (5th Cir. 1979); *Flowers v. Crouch-Walker Corp.*, 552 F.2d 1277, 1282–83 (7th Cir. 1977); *Oshiver v. Court of Common Pleas*, 469 F.Supp. 645, 649 (E.D.Pa.1979). While the court recognizes that the burden of establishing such a prima facie case is not "onerous" nor "overly demanding," *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1094; *Whack v. Peabody & Wind Engineering Co.*, 595 F.2d 190, 193 n.11 (3d Cir. 1979), Reichman has not satisfied all the elements of a prima facie case by a preponderance of the evidence. The evidence fails to support a determination that a non-White was employed in a position comparable to Reichman's former position or that her discharge was otherwise made under circumstances which give rise to an inference of unlawful discrimination. As we indicated, a shift in emphasis from

*Id.* at 436. Moreover, conclusory allegations that a class is so numerous that joinder is impracticable are not sufficient in the absence of proof to meet the requirement of Rule 23(a)(1). *Valentino v. Howlett*, 528 F.2d 975, 978 (7th Cir. 1976). In light of her inability to present claims typical of the requested class, Reichman has not provided this court with any evidence that "the class is so numerous that joinder of all members is impracticable ...." Fed.R.Crim.P. 23(a)(1).

the work performed by the PTA Division to work done by the PRE Division resulted in PTA being reduced from a division to a unit and the position of Chief of PTA, Reichman's former position, was abolished. Initially, no one was placed in charge of the PTA Unit and the staff reported to Defendant Sawyer. Ultimately, Iris Cooley, a well-qualified black female, was named supervisor of the unit. Cooley, however, remained an EODS IV during this time period, did not receive any increase in salary, and had fewer responsibilities because of the decrease in PTA staff and duties. Furthermore, the court has concluded that because of the small sample size, Reichman has not established a prima facie case on the basis of statistical evidence.[91]

■ Even if Reichman had established a prima facie case of discrimination, she would have failed to satisfy her ultimate burden of persuasion. In *Burdine*, the Supreme Court explained the intermediate burden that shifts to the Defendants, as follows:

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. To accomplish this, the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection. The explanation provided must be legally sufficient to justify a judgment for the defendant.

450 U.S. at 254–55, 101 S.Ct. at 1094 (footnotes and citation omitted). The Defendants satisfied this burden of production by clearly setting forth legitimate, nondiscriminatory reasons for discharging Reichman. As the testimony demonstrated, state budget reductions required BAA to furlough employees or reduce expenses by some other method. Defendants examined alternate methods of reducing BAA's budget through the furlough of three clerical positions and one technical position or the furlough of two management positions. Since BAA was overloaded in management positions and because of a shift in emphasis from the PTA Division to the PRE Division, Defendants determined that the best choice was to abolish the position of Chief of the PTA Division as one of the management positions. Reichman's furlough was made in compliance with civil service regulations in effect at that time. Reichman, who was an EODS V, was compared with all other employees, who were EODS V, in the Office of Administration (OA) and had regular civil service status. On the basis of the last performance evaluation, the Personnel Officer in OA determined that Reichman should be furloughed instead of Frederick Brooks, the only other EODS V in OA. These facts, as elaborated upon in Part II of this opinion, would clearly rebut any presumption raised by Reichman's prima facie case, assuming she established such a case, and would "frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext." 450 U.S. at 255–56, 101 S.Ct. at 1094–95.

■ Accordingly, the burden of proving mere pretext returns to the Plaintiff and merges with her ultimate burden of persuading the court that she has been a victim of intentional discrimination. Reichman "may succeed in this either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. at 1095. Although Reichman asserted several grounds which she contends demonstrate that the Defendants' articulated reasons are a mere pretext or otherwise unworthy of credence, the court concludes that Reichman failed to prove intentional discrimination, either di-

**91.** *See* n.45 *supra.*

rectly or indirectly. Reichman primarily depends upon Defendant Harley's memorandum of September 15, 1977, to Defendant Wade concerning the transfer of Reichman out of BAA and the substitution of Cooley as Chief of the PTA Division to support her claim.[92] Harley testified that he made this proposal because Churchill Kohlman had indicated an interest in having Reichman on his staff. Reichman failed to controvert this evidence. Similarly, Reichman contends that the Defendants failed to present credible evidence with regard to the shift in emphasis from PTA to PRE.[93] In this respect, it also appears that Reichman does not understand the effect of *Burdine*. Under *Burdine*, the burden of persuasion never falls upon the employer. 450 U.S. at 257–58, 101 S.Ct. at 1095–96. Reichman, however, would place such a burden on the Defendants by requiring them to produce persuasive evidence to disprove allegations which she has made. While several employees of BAA testified about the shift in emphasis from the technical assistance provided by the PTA Division to the planning, review and analysis aspects of the PRE Division, Reichman produced no evidence to discredit such testimony.

She likewise failed to carry her burden of persuasion with respect to other allegations. When Reichman came to BAA from the Pennsylvania Department of Environmental Resources, she contends that Harley promised her a two-step pay increase. Harley stated that he never promised her such an increase but merely stated that he would try to get a two-step increase for her. Indeed, Harley made at least two requests for such an increase to Terrence Spaar, Executive Assistant to Defendant Wade. Nevertheless, Spaar and Michael Epoca, Director of the Office of Personnel, testified that

under Commonwealth personnel rules Reichman was not entitled to a two-step pay increase.[94] In addition, the abolishment of the Attorney II position in BAA would not have saved money since the position was "frozen." The mere assertion of numerous allegations of pretext in the absence of evidentiary support does not satisfy Reichman's ultimate burden of persuading the court that she has been a victim of discrimination. Reichman's credibility is also impaired by the obvious change in her conduct toward the Defendants and other employees at BAA subsequent to her receipt of the furlough notice. The court has also considered the numerous threats that Reichman made against Defendant Harley and BAA at the time of her furlough. Accordingly, we conclude that Reichman has failed to prove by a preponderance of the evidence that Defendants' legitimate, nondiscriminatory reasons for furloughing Reichman were a mere pretext or unworthy of credence.

## C. Retaliatory Discharge Claim

Title VII also prohibits an employer from discriminating against an employee who has opposed any practice made an unlawful employment practice by Title VII. 42 U.S.C. § 2000e–3(a).[95] The elements of a prima facie case of retaliatory discharge were outlined in *Oshiver v. Court of Common Pleas*, 469 F.Supp. 645 (E.D.Pa.1979). In that case, the court indicated:

> To establish a *prima facie* claim that her discharge was retaliatory, plaintiff would have to demonstrate that she engaged in protected employee activity, that she was discharged, and that there appeared to be a causal connection between the activity and the discharge. Again, defendant would then have the

92. Plaintiff's Ex. 42.

93. Plaintiff's post trial reply memorandum doc. no. 134a, p.4.

94. Tr. 182–83, 983–87, 1340–44.

95. The Pennsylvania Human Relations Act similarly provides that it shall be an unlawful discriminatory practice

> For any employer, employment agency or labor organization to discriminate in any manner against any individual because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act.

43 P.S. § 955(d) (Purdon's 1964).

burden of demonstrating a legitimate, non-retaliatory reason for plaintiff's discharge.

*Id.* at 649 (emphasis original), *citing, Hochstadt v. Worcester Foundation For Experimental Biology*, 425 F.Supp. 318, 324 (D.Mass.), *aff'd*, 545 F.2d 222 (1st Cir. 1976). *See also Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325 (5th Cir. 1980); *Sutton v. National Distillers Products Co.*, 445 F.Supp. 1319, 1325–26 (S.D.Ohio 1978), *aff'd*, 628 F.2d 936 (6th Cir. 1980). For the reasons that follow, the court concludes that Reichman has failed to establish a prima facie case of retaliatory discharge.

 Initially, we find no basis for determining that Reichman was engaged in a protected activity. In support of her claim, Reichman contends that Defendants obstructed a full and fair investigation of the issues raised by the ethnic agencies concerning affirmative action programs and policies. She further asserts that she was furloughed to prevent her from participating in such an investigation. Reichman, however, never indicated to Defendants that she "reasonably believed" that any unlawful practices existed at that time or that she actually opposed such practices. Indeed, Reichman reported that the Southeast Region of the Department of Public Welfare (SEDPW) had no utilization problems. Moreover, Reichman herself had recommended approval of the affirmative action plan for the Department of Public Welfare.[96] Finally, Reichman continued to work without objection on the affirmative action plan for the Bureau of Vocational Rehabilitation until the date her furlough became effective. *See Sias v. City Demonstration Agency*, 588 F.2d 692, 695 (9th Cir. 1978); *Hearth v. Metropolitan Transit Commission*, 436 F.Supp. 685, 688–89 (D.Minn. 1977).

 The only controversy that did exist concerning the investigation of SEDPW was in regard to the individual claims of discrimination. Reichman wanted to personally investigate such claims even though she had no responsibility or duty to perform such functions. The PTA Division's only duty in regard to individual complaints of discrimination was advising and providing state agencies or employees with consultation about specific grievances. Indeed, BAA had no investigatory function with respect to individual discrimination complaints.[97] Reichman was informed of this limitation on BAA's functions numerous times prior to this occasion. Under such circumstances, the court is persuaded that Reichman was not engaged in a protected activity. Title VII does not permit Reichman to expand her job into a role that was never intended.

Even if Reichman had established a prima facie case, we would continue to hold in favor of Defendants on this claim. While the Defendants satisfied their burden of production by showing that the budget crisis was a legitimate, non-retaliatory reason for Reichman's furlough, Reichman failed to persuade this court by a preponderance of the evidence that such a reason was a mere pretext or unworthy of credence.

### D. Religious Discrimination Claim

In Count III of the complaint, Reichman asserts a claim of religious discrimination in violation of Title VII on the basis of Defendants alleged slurs against her religious beliefs and Jews in general and because a meeting was scheduled on Yom Kippur in 1977. For purposes of this claim, the relevant sections of Title VII provide:

(a) It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin . . . .

42 U.S.C. § 2000e–2(a).

The term "religion" includes all aspects of religious observance and practice, as

---

**96.** Tr. 1289.

**97.** Defendants' Ex. 1.

well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business.

42 U.S.C. § 2000e(j).[98] To establish a prima facie case of religious discrimination under Title VII,

> [A] plaintiff must plead and prove that (1) he has a bona fide belief that compliance with an employment requirement is contrary to his religious faith; (2) he informed his employer about the conflict; and (3) he was discharged because of his refusal to comply with the employment requirement.

*Brown v. General Motors Corp.*, 601 F.2d 956, 959 (8th Cir. 1979) (footnote omitted). *See also Anderson v. General Dynamics Convair Aerospace Division*, 589 F.2d 397, 401 (9th Cir. 1978), *cert. denied*, 442 U.S. 921, 99 S.Ct. 2848, 61 L.Ed.2d 290 (1979); *Edwards v. School Board of Norton, Virginia*, 483 F.Supp. 620, 624 (W.D.Va.1980), *vacated on other grounds*, 658 F.2d 951 (4th Cir. 1981).

 Although the evidence indicated that Reichman had not requested leave on Rosh Hashanah in 1977, no evidence conflicts with the view that her observance of Yom Kippur on September 22, 1977, was a bona fide religious belief. Furthermore, she informed Defendant Harley of her inability to attend the Affirmative Action Task Force meeting on September 22, 1977. Reichman, however, failed to prove a causal connection between her furlough and her failure to attend the meeting on Yom Kippur. First, Reichman never indicated that she was "ordered to work on any day which was sacred to [her] religion." *Brown v. Ralston Purina Co.*, 557 F.2d 570, 572 (6th Cir. 1977). Second, scheduling of a meeting on Yom Kippur does not itself constitute religious discrimination. We find no basis for concluding that her failure to attend the meeting interfered with her ability to perform her job since minutes of the meeting were available and Reichman could talk with other BAA employees who had attended the meeting. Third, Defendants made a reasonable accommodation to Reichman's observance of Yom Kippur. Rescheduling of the meeting would have caused an undue hardship because employees of approximately forty state agencies were attending. Nevertheless, Reichman's request for leave with pay was approved and she was not required to attend the meeting.[99] *United States v. City of Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976), *cert. denied*, 433 U.S.

---

**98.** The Pennsylvania Human Relations Act makes specific provisions concerning discrimination against a public employee because of the observance of religious holy days. The relevant portions of the Act provide, in part:

> (a) It shall be an unlawful discriminatory practice for any officer, agency or department of the State or any of its political subdivisions, to prohibit, prevent or disqualify any person from, or otherwise to discriminate against any person in, obtaining or holding employment by the State or by any such subdivision, because of his observance of any particular day or days or any portion thereof as a sabbath or other holy day in accordance with the requirements of his religion.
>
> (b) Except as may be required in an emergency or where his personal presence is indispensable to the orderly transaction of public business, *no person employed by the State or any of its political subdivisions shall be required to remain at his place of employment during any day or days or portion thereof that, as a requirement of his religion, he observes as his sabbath or other holy day,*

including a reasonable time prior and subsequent thereto for travel between his place of employment and his home, provided however, that *any such absence from work shall, wherever practicable in the judgment of the employer, be made up by an equivalent amount of time and work at some other mutually convenient time, or shall be charged against any leave with pay ordinarily granted,* other than sick leave, provided further, however, that any such absence not so made up or charged, may be treated by the employer of such person as leave taken without pay. 43 P.S. § 955.1 (Purdon's Supp.1981) (emphasis added). The Equal Employment Opportunity Commission Guidelines on Discrimination Because of Religion, 29 C.F.R. Part 1605 (1981), set forth further obligations of employers to reasonably accommodate the religious practices of employees.

**99.** Approval of Reichman's leave with pay satisfied the provisions of the Pennsylvania Human Relations Act. *See* n.98 *supra.*

909, 97 S.Ct. 2974, 53 L.Ed.2d 1092 (1977) (regulations reasonably accommodated employee's religious observances by permitting trading shifts, taking leave with pay or taking leave without pay). Finally, Defendants' comments cannot be construed as slurs of Reichman's religious beliefs nor do such comments prove that her furlough was causally related to her religion. As we indicated, comments concerning the Arab-Israeli conflict and Menachim Begin were political opinions rather than disparagements of Judaism. Furthermore, while Harley acknowledged that he disagreed with various ethnic groups, including Jewish organizations, that opposed affirmative action, no convincing evidence satisfies the court that Harley assumed that Reichman was associated with such groups because of her religion. While "derogatory comments could be so excessive and opprobrious as to constitute an unlawful employment practice under Title VII," such comments made in casual conversation or in isolated instances do not rise to the level necessary to constitute a Title VII violation. *Cariddi v. Kansas City Chiefs Football Club, Inc.*, 568 F.2d 87, 88 (8th Cir. 1977). *See also International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 336 n.16, 97 S.Ct. 1843, 1854 n.16, 52 L.Ed.2d 396 (1977); *Fekete v. United States Steel Corp.*, 353 F.Supp. 1177, 1186–87 (W.D.Pa.1973). The court finds that the comments made by Defendants were merely part of casual conversation and were not so excessive so that a discriminatory work environment resulted.

■ After reviewing all of this evidence, we are not persuaded by a preponderance of the evidence that Reichman's furlough was based upon her religious practices or beliefs. The budget crisis was a legitimate, nondiscriminatory reason for furloughing Reichman and we find no basis to conclude that such a reason was a mere pretext or unworthy of credence. Reichman's aggregation of discrimination claims on varying grounds has not influenced the court to the contrary.

**E. Sexual Harassment Claim**

■ While Reichman's complaint alleges a general claim of sexual discrimination in violation of Title VII with respect to the terms and conditions of employment against Reichman and other female employees, the evidence at trial was limited to a single incident of alleged sexual harassment involving Reichman and Defendant Harley. In *Tomkins v. Public Service Electric & Gas Co.*, 568 F.2d 1044 (3d Cir. 1977), the Court of Appeals for the Third Circuit reviewed the court decisions concerning sexual advances and concluded:

The courts have distinguished between complaints alleging sexual advances of an individual or personal nature and those alleging direct employment consequences flowing from the advances, finding Title VII violations in the latter category. This distinction recognizes two elements necessary to find a violation of Title VII: first, that a term or condition of employment has been imposed and second, that it has been imposed by the employer, either directly or vicariously, in a sexually discriminatory fashion. Applying these requirements to the present complaint, we conclude that Title VII is violated when a supervisor, with the actual or constructive knowledge of the employer, makes sexual advances or demands toward a subordinate employee and conditions that employee's job status—evaluation, continued employment, promotion, or other aspects of career development—on a favorable response to those advances or demands, and the employer does not take prompt and appropriate remedial action after acquiring such knowledge.

*Id.* at 1048–49. Accordingly, when acquiescence in the sexual advance is not related to continuation or conditions of employment, such conduct does not constitute sexual discrimination under Title VII. *Corne v. Bausch And Lomb, Inc.*, 390 F.Supp. 161 (D.Ariz.1975), *rev'd and remanded on other grounds*, 562 F.2d 55 (9th Cir. 1977). *See also Walter v. KFGO Radio*, 518 F.Supp. 1309, 1314–16 (D.N.D.1981); *Hill v. BASF*, 26 Fair Empl.Prac.Cas. 66 (E.D.Mich.1981). The Equal Employment Opportunity Com-

mission, however, has promulgated guidelines that expand upon this narrow view of sexual harassment. Guidelines On Discrimination Because Of Sex, 29 C.F.R. Part 1604. These guidelines provide, in pertinent part:

(a) Harassment on the basis of sex is a violation of Sec. 703 of Title VII. Unwelcome sexual advances, requests for sexual favors, and other verbal or physical conduct of a sexual nature constitute sexual harassment when (1) submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment, (2) submission to or rejection of such conduct by an individual is used as the basis for employment decisions affecting such individual, or (3) such conduct has the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive working environment.

(b) In determining whether alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis.

29 C.F.R. § 1604.11(a)–(b) (1981) (footnote omitted). In *Bundy v. Jackson*, 641 F.2d 934 (D.C.Cir.1981), the Circuit Court of Appeals for the District of Columbia also adopted a broad view of sexual harassment by "finding Title VII violations where an employer created or condoned a substantially discriminatory work *environment*, regardless of whether the complaining employees lost any tangible job benefits as a result of the discrimination." *Id.* at 943–44. Even applying such expanded concepts of sexual harassment, we find no violation of Title VII in the case at bar.

We initially focus on whether Defendant Harley's alleged sexual advances and attempt to kiss Reichman were "unwelcome." As we previously indicated, Reich-

man behaved in a very flirtatious and provocative manner around Harley. Despite his repeated refusals, Reichman asked Harley to have dinner at her house on several occasions. Furthermore, Harley did not encourage Reichman's behavior or otherwise sexually harass any other women at BAA. In addition, Reichman continued to conduct herself in a similar manner after the alleged kissing incident. The court is thus persuaded that no unwelcome sexual advances were made by Defendant Harley.

Even assuming that the advances were unwelcome, we find no violation of Title VII. Clearly, Harley did not make submission to his advances "either explicitly or implicitly a term or condition of [her] employment." 29 C.F.R. § 1604(a)(1). Reichman did not testify to any such terms or conditions. In addition, Reichman failed to prove that her alleged rejection of Harley's advances was used as the basis for her furlough. 29 C.F.R. § 1604(a)(2). If such had been the situation, Harley would have attempted to furlough Reichman during the first furlough period. After the alleged incident, Reichman continued to perform her job-related duties and behaved toward Harley as she had in the past. Finally, Reichman did not establish that Harley's conduct had "the purpose or effect of unreasonably interfering with an individual's work performance or creating an intimidating, hostile, or offensive work environment." 29 C.F.R. § 1604.11(a)(3). Unlike *Bundy v. Jackson*, 641 F.2d at 939–40, the alleged sexual harassment occurred in a single and isolated instance. Reichman only testified with respect to this lone incident. Furthermore, other female employees at BAA testified that Harley had never sexually harassed them. Accordingly, the court concludes that the alleged conduct of Harley did not create a substantially discriminatory work environment. Instead, the court's view of the circumstances coincides with the determination of the court in *Walter v. KFGO Radio*, 518 F.Supp. 1309 (D.N.D.1981), which concluded that "[i]t is apparent that plaintiff has *ex post facto* seized on these incidents in an attempt to gain reinstatement ...." *Id.* at 1316.

## F. Reichman's Remaining Discrimination Claims

In addition to her Title VII claims, Reichman has raised individual claims of discrimination on the basis of her race, color, religion and sex pursuant to 42 U.S.C. §§ 1981[100] and 1983, the Fourteenth Amendment of the United States Constitution, and the Pennsylvania Human Relations Act, 43 P.S. §§ 951–963 (Purdons) and conspiracy claims pursuant to 42 U.S.C. §§ 1985(3) and 1986. Turning first to Reichman's claims under § 1981, § 1983, and the Fourteenth Amendment, we recognize that such claims are distinct and independent from Title VII claims. *Johnson v. Railway Express Agency*, 421 U.S. 454, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975). Accordingly, courts have determined that proof which would be sufficient to establish a violation of Title VII does not satisfy such claims. Instead, since the Supreme Court's decision in *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), it has become well-established law that § 1981, § 1983 and Fourteenth Amendment equal protection claims require proof of purposeful discrimination. *See, e.g., Croker v. Boeing Co.*, 662 F.2d 975, 984–89 (3d Cir. 1981); *Guardians Association v. Civil Service Commission*, 633 F.2d 232, 264 (2d Cir. 1980), *appeal pending; Craig v. County of Los Angeles*, 626 F.2d 659, 668 (9th Cir. 1980), *cert. denied*, 450 U.S. 919, 101 S.Ct. 1364 (1981); *Thompson v. School District of Omaha*, 623 F.2d 46, 48 (8th Cir. 1980) ("[T]he burden of proving intent to discriminate rests with the plaintiff in a section 1983 action ...."); *Crawford v. Western Electric Co.*, 614 F.2d 1300, 1309 (5th Cir. 1980); *Williams v. Anderson*, 562 F.2d 1081, 1086 (8th Cir. 1977) ("[P]laintiffs must prove an intent to discriminate on the part of the defendants to prevail in a § 1983 action."); *City of Milwaukee v. Saxbe*, 546 F.2d 693, 705 (7th Cir. 1976). Yet, while Reichman must demonstrate discriminatory purpose, it need only be a motivating factor, not the sole purpose, of the challenged action. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265–66, 97 S.Ct. 555, 563, 50 L.Ed.2d 450 (1977). The court's findings, as discussed with respect to Reichman's Title VII claim, fail to disclose that any racially discriminatory purpose motivated the Defendants.[101]

Similarly, a claim under 42 U.S.C. § 1985(3)[102] requires a showing of discriminatory intent. In *Carter v. Cuyler*, 415 F.Supp. 852 (E.D.Pa.1976), the court set forth the essential elements of a § 1985(3) claim, as follows:

> To state a claim under § 1985(3), plaintiff must allege and support with the

**100.** The unambiguous statutory language and the emphatic contemporanous statements by legislators have led numerous courts to conclude that a claim of sex discrimination is not cognizable under § 1981. *See Bobo v. ITT, Continental Baking Co.*, 662 F.2d 340, 344–45 (5th Cir. 1981), and cases cited therein. For similar reasons, courts have determined that religious discrimination claims may not be brought pursuant to § 1981. *Manzanares v. Safeway Stores, Inc.*, 593 F.2d 968, 971 (10th Cir. 1979); *Khawaja v. Wyatt*, 494 F.Supp. 302, 304 (W.D.N.Y.1980).

**101.** Having found no violation of 42 U.S.C. § 1983, the court need not rule on Defendants' claim of a good faith defense to the § 1983 cause of action.

**102.** 42 U.S.C. § 1985(3) provides in pertinent part:

> If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; ... in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

requisite factual specificity the following elements: (1) a conspiracy by the defendants; (2) designed to deprive plaintiff of the equal protection of the laws; (3) the commission of an overt act in furtherance of that conspiracy; (4) a resultant injury to person or property or a deprivation of any right or privilege of citizens; and (5) *defendant's [sic] actions were motivated by a racial or otherwise class-based invidiously discriminatory animus.*

*Id.* at 857 (emphasis added), *citing, Griffin v. Breckenridge,* 403 U.S. 88, 102–03, 91 S.Ct. 1790, 29 L.Ed.2d 338 (1971). While we recognize that *Novotny v. Great American Federal Savings & Loan Association,* 584 F.2d 1235, 1256–57 (3d Cir. 1978), *vacated on other grounds,* 442 U.S. 366, 99 S.Ct. 2345, 60 L.Ed.2d 957 (1979), indicates that the Defendants could conspire among themselves even though employed within the same agency or department, Reichman has not offered sufficient evidence to establish the existence of a conspiracy or any "racial or otherwise class-based invidiously discriminatory animus." As a consequence, Reichman has also failed to prove her cause of action under 42 U.S.C. § 1986.[103] If a plaintiff does not prove a violation of § 1985, no cause of action under § 1986 exists. *Williams v. St. Joseph Hospital,* 629 F.2d 448, 452 (7th Cir. 1980); *Hamilton v. Chaffin,* 506 F.2d 904, 913–14 (5th Cir. 1975); *Lyon v. Temple University,* 507 F.Supp. 471, 479 (E.D.Pa.1981).

 Finally, while the parties have not suggested the proper burden of proof that the court should use in evaluating Reichman's claim for violation of the Pennsylvania Human Relations Act, we conclude that Reichman has not proven her claim. Defendants' testimony that Reichman was furloughed in response to the state budget crisis was supported by substantial evidence and, in the absence of evidence that the explanation was fabricated, should not be disregarded. *See Slippery Rock State College v. Pennsylvania Human Relations Commission,* 11 Pa.Commw.Ct. 501, 505, 314 A.2d 344 (1974).

### G. Reichman's Defamation Claim

 Reichman has also asserted a pendent state claim for defamation on the basis of certain alleged statements made by Defendant Harley concerning Reichman's morality and the memorandum of November 10, 1977, which was prepared by Defendant Harley. In such a claim, Pennsylvania law is controlling. In accordance with Pennsylvania law, Reichman thus has the burden of proving, when the issue is properly raised:

(1) The defamatory character of the communication.

(2) Its publication by the defendant.

(3) Its application to the plaintiff.

(4) The understanding by the recipient of its defamatory meaning.

(5) The understanding by the recipient of it as intended to be applied to the plaintiff.

(6) Special harm resulting to the plaintiff from its publication.

(7) Abuse of a conditionally privileged occasion.

42 Pa.C.S.A. § 8343, reenacting the Act of August 21, 1953, 12 P.S. § 1584a. With respect to Reichman's contention that Harley defamed her by stating that he could have had sexual relations with Reichman, we conclude that Reichman failed to satisfy her burden regarding the publication by the Defendant. While words imputing immorality are actionable per se if proven, *Baird v. Dun & Bradstreet,* 446 Pa. 266, 273–74, 285 A.2d 166 (1971), the only witness to the alleged statement was Ernest Conley, a

---

**103.** Every person who, having knowledge that any of the wrongs conspired to be done, and mentioned in section 1985 of this title, are about to be committed, and having power to prevent or aid in preventing the commission of the same, neglects or refuses so to do, if such wrongful act be committed, shall be liable to the party injured, or his legal representatives, for all damages caused by such wrongful act, which such person by reasonable diligence could have prevented . . . .
42 U.S.C. § 1986.

close friend to Reichman. Conley's testimony regarding the statement was that "[Harley] mentioned that he could have had sexual relations with Ms. Reichman and he could [sic] have had, and he was sorry that he didn't or words to that effect." [104] Conley, however, was not a persuasive witness because of his relationship with Reichman. While Harley's self-interest has been considered, the court finds his denial of making that statement more credible in light of other testimony concerning Harley's character and conduct at BAA.

▬▬▬ Reichman's remaining defamation allegation requires further analysis. The statements in question which are contained in the memorandum of November 10, 1977, concern the fact that Reichman was furloughed effective on November 9, 1977, and that the state agencies to which Harley sent the memorandum should not have official discussions with Reichman regarding the affirmative action program.[105] In this case, there is no issue of the publication by Harley or the application of the memorandum to Reichman. Accordingly, the court must first determine whether the communication is capable of a defamatory meaning and then whether it was so understood by the recipients. *Corabi v. Curtis Publishing Co.*, 441 Pa. 432, 442, 273 A.2d 899 (1971). The appropriate standard to determine whether such statements are defamatory, as set forth in the Restatement of Torts, § 559, is that "[a] communication is defamatory if it tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from associating or dealing with him." *Cosgrove Studio And Camera Shop, Inc. v. Pane*, 408 Pa. 314, 318, 182 A.2d 751 (1962); *Birl v. Philadelphia Electric Co.*, 402 Pa. 297, 303, 167 A.2d 472 (1960). Moreover, "[u]nder Pennsylvania law innuendo may be used to explain in what manner the article is defamatory. The innuendos, however, must be 'warranted, justified and supported

by the publication.'" *Sellers v. Time, Inc.*, 423 F.2d 887, 890 (3d Cir.), *cert. denied*, 400 U.S. 830, 91 S.Ct. 61, 27 L.Ed.2d 61 (1970). While we question whether the memorandum is capable of a defamatory meaning, Reichman presented no evidence that the recipients understood it as having such a meaning. The only witness to testify about the effect of the memorandum stated that he did not know what it meant except that Reichman was furloughed. Thus, Reichman did not satisfy her burden of proof in this respect. *Weider v. Hoffman*, 238 F.Supp. 437, 441 (M.D.Pa.1965).

▬▬▬ In any event, Harley's communication of the statements was privileged. Harley is entitled to the absolute immunity of a high public official or, at a minimum, to a qualified privilege. In *Matson v. Margiotti*, 371 Pa. 188, 88 A.2d 892 (1952), the court observed that:

Absolute privilege, as its name implies, is unlimited, and exempts a high public official from all civil suits for damages arising out of false defamatory statements and even from statements or actions motivated by malice, *provided the statements are made or the actions taken in the course of the official's duties or powers and within the scope of his authority, or as it [is] sometimes expressed, within his jurisdiction.*

*Id.* at 193–94 (emphasis original). Since courts have granted such immunity to district attorneys, *McCormick v. Specter*, 220 Pa.Super.Ct. 19, 275 A.2d 688 (1971), the State Commissioner of Deep Mine Safety and two Bituminous Mine Inspectors, *Lucy v. Muchnok*, 36 Pa.Commw.Ct. 272, 387 A.2d 945 (1978), and a Deputy Commissioner of Public Property and a City Architect, *Montgomery v. City of Philadelphia*, 392 Pa. 178, 140 A.2d 100 (1958), we have no doubt that Harley, as the Director of BAA, is a high public official for purposes of granting absolute immunity. Moreover, the statements

---

**104.** Tr. 88.

**105.** *See* pp. 28–29 *supra*.

were "closely related" to the performance of his official duties since his purpose was to prevent the spread of false information by a former employee. *McCormick v. Specter*, 220 Pa.Super.Ct. at 22, 275 A.2d 688. On the same basis, Harley is entitled to a qualified privilege. 22 P.L.E., Libel and Slander § 35 ("Such matter may be so privileged if published by an employer in order to protect himself against the acts or statements of a present or former employee."). In addition, the communication was made "from a proper motive, in a proper manner and based upon reasonable cause." *Keddie v. Pennsylvania State University*, 412 F.Supp. 1264, 1277 (M.D.Pa.1976). After learning of Reichman's accusations, Harley sent the memorandum, upon advice of legal counsel, to those state agencies with which BAA had contact. In addition, the language was not excessive nor unreasonable under the circumstances. Although Reichman has the burden of demonstrating an abuse of the privilege, she has not met her burden. *Rankin v. Phillippe*, 206 Pa.Super.Ct. 27, 32–33, 211 A.2d 56 (1965).

## IV. CONCLUSION

On the basis of the foregoing, which constitutes the court's findings of fact and conclusions of law, *see* Rule 52(a) of the Federal Rules of Civil Procedure, we conclude that Reichman's pattern and practice claim must be dismissed for lack of standing and that she is not entitled to relief with respect to her remaining claims.

An appropriate order will be entered.